IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:20CR00185 JAR (ACL) |
| | ) | |
| CAMERON C. ACOSTA, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS PRIOR TO HEARING

### Introduction

Cameron Acosta is charged in a three-count indictment with: (1) Possession with Intent to Distribute Cocaine; (2) Possession with Intent to Distribute Marijuana; and (3) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, for events occurring on April 2, 2018, in Ripley County, Missouri.  Acosta filed a motion to suppress the physical evidence seized and the statements he made following the execution of a search warrant at a residence located at County Road 142E-8, Route 3, Box 9766, in Doniphan, Missouri, where a quantity of cocaine, marijuana, and firearms were seized.  Acosta challenges the validity of the search warrant and the sufficiency of the probable cause to obtain the warrant.  Acosta further challenges the probable cause to arrest him and the lawfulness and voluntariness of his statements. Acosta's claims are without merit.

## Factual Background

On April 2, 2018, law enforcement officials executed a state search warrant at a residence in Ripley County, Missouri based upon information that narcotics and firearms were present inside.  There were three adult occupants in the home during the execution of the warrant: Cameron Acosta; James Moore; and Kelsey Payne.  A two-year-old child and a 6-day-old infant were also present inside the home.  Officers seized over 8 pounds of marijuana, 60 grams of cocaine, a small quantity of Ecstasy; and four firearms, including a Romarm AK-47 assault rifle; a Heritage .22 caliber revolver; a Marlin .22 caliber semi-automatic rifle; and a Sig Sauer .40 caliber semi-automatic pistol.  Additional items seized included various ammunition, digital scales, and plastic baggies.  All three adults were arrested and transported to the Ripley County Sheriff's Department.

One week prior, on March 26, 2018, Sergeant Jesse Drum applied for a search warrant to search the residence of James Moore for drug related activity.  The warrant expressed:

> The property, article, material, substance, or person to be searched for and seized is described as follows: Marijuana, Cocaine, Methamphetamine, drug paraphernalia, and any other item for which possession is an offense under the laws of this state.

Probable cause for the warrant was based upon information from a confidential source (CS) that CS had purchased cocaine and marijuana from James Moore numerous times in the past year.  The Search Warrant Affidavit stated:

On March 24, 2018, at approximately 22:30 hours, I, Sgt. Drum spoke with a confidential source. The confidential source stated they have purchased quantities of marijuana, cocaine, and Xanax bars from James Moore at his residence located on County Road 142E-8, in Ripley County, Missouri. The confidential source stated they have purchased a[n] eight ball of cocaine from James Moore approximately three weeks ago. The confidential source stated they have purchased up to a quarter pound of marijuana from James Moore and that James Moore has agreed to sell [CS] up to an ounce of cocaine. The confidential source stated they have been purchasing narcotics from James Moore for the last year, and James Moore always has narcotics to sell to them. The confidential source wrote a written statement stating what they stated to me. The confidential source described the residence of James Moore as a white mobile home on County Road 142E-8, and identified the residence on Google Earth in order to obtain GPS Coordinates of the residence. The confidential source stated James Moore has firearms inside the residence as well. Based upon statements made to me by a confidential source, I have probable cause to search the residence of James Moore.

The warrant was signed by Ripley County Circuit Court Judge Thomas David Swindle at 1:40 P.M. on Friday, March 26, 2018, and executed one week later, on Friday, April 2, 2018, at 8:30 P.M. The warrant was served by officers with the Southeast Missouri Drug Task Force (SEMO-DTF), the Missouri State Highway Patrol (MSHP), and the Ripley County Sheriff's Department. The one-week delay in executing the warrant was due, in part, to a previously scheduled narcotics training in Springfield, Missouri, that caused several veteran officers, including Sgt. Drum and Task Force Officer Scott Johnston, to be unavailable until the following week. The warrant was thereafter executed on the date that the officers returned from their training.

The officers knocked and announced their presence several times but after receiving no response, forced entry was made through the front door. Moore and Acosta were located at either ends of the residence and were placed in handcuffs for officer safety. Payne was

3

seated at the kitchen table holding her newborn baby and the decision was made to leave her unrestrained.  All three adults were escorted into the living room where they were read the search warrant and their Miranda rights.

Most of the contraband seized from the residence was located inside a black duffle bag that was found in the hallway of the residence directly outside a bedroom on the west-end of the residence.  Acosta later told law enforcement officers that the duffle bag and its contents were his.  The following items were found inside the duffle bag: five vacuum sealed bags containing marijuana; two quart size baggies containing marijuana; a yellow Dollar General bag containing marijuana; a glass jar containing marijuana; a quart size baggie containing cocaine; a nylon pouch containing Ecstasy; a Romarm AK-47 assault rifle; eight rounds of 9mm ammunition; and seven rounds of .40 caliber ammunition.

The west-end bedroom, that was identified as Acosta's bedroom, contained the following seized items: two baggies of cocaine; a Heritage Rough Rider, .22 caliber revolver with a defaced serial number; and a Marlin .22 caliber semi-automatic rifle with a scope.  The narcotics and firearms were located inside or resting against a plastic storage container in the bedroom, referred to in the police reports as a shelf.

In the east end bedroom that was identified as Moore and Payne's bedroom approximately 3.5 grams of cocaine and a loaded Sig Sauer .40 caliber semi-automatic pistol were found in a nightstand.  Moore told police the firearm was Acosta's and explained he had taken the gun and put it in his nightstand to keep it out of reach of his

two-year-old child.  Moore was later determined to be a convicted felon who could not lawfully possess firearms.

Additional contraband was found in the kitchen, including 41 grams of marijuana and 27 grams of cocaine.  As this was a common area of the residence, all occupants had access; however, no one volunteered ownership of the items seized from the kitchen.

The illegal contraband was seized by law enforcement officers and transported to the Ripley County Sheriff's Department to be placed into evidence.  The items were inventoried and photographed.  The firearms remained in evidence and the narcotics were sent to the Southeast Missouri State Highway Patrol Crime Laboratory for testing.

At the Ripley County Sheriff's Department, Acosta was again read his Miranda rights and agreed to speak to Sgt. Drum and TFO Johnston.  During this post-Miranda interview, Acosta admitted that the duffle bag seized from the hallway of the residence was his.  He told the officers that the white powder found in the duffle bag was "Yolo" and further explained that Yolo was cocaine but it was disrespectful to call it cocaine.  He also stated he believed he had three pounds of "Loud" marijuana in the bag, two or three pounds of "Mid" marijuana, and three pounds of "Reggie" marijuana.  He explained that "Loud" marijuana was medical grade, "Mid" was a cross-breed of medical grade and regular marijuana, and "Reggie" was just regular marijuana.  Acosta admitted that he sells the "Loud" marijuana for twenty dollars per gram.  TFO Johnston asked Acosta how much the marijuana in the bag was worth and Acosta said it depended on how it was sold but further

claimed he had approximately $7,000.00 worth of marijuana in the bag.  Acosta also told TFO Johnston that he had purchased the Heritage Rough Rider, .22 caliber revolver for $35.00.

Acosta, Moore, and Payne were subsequently charged in Ripley County with numerous drug and weapons offenses and Endangering the Welfare of a Child.  A Motion to Suppress was filed in state court challenging the validity of the search warrant and contending it was null and void for a numerical error in the address; namely the residence searched was County Road 142E-8, Route 3, Box *9766*, whereas the search warrant incorrectly identified it as County Road 142E-8, Route 3, Box *9788*.  (Govt. Exhibit 1).  The hearing on the MTS was taken up along with the Preliminary Hearings for all three defendants.  Judge Swindle granted the motion to suppress for the following reason: "Motion to Suppress sustained; The Court finds that the search warrant wasn't executed as soon as practical."  (Govt. Exhibit 2).  The prosecutor then dismissed the charges as reflected in the Case.net docket entry for July 26, 2018:

> "Dismissed by Prosec/Nolle Pros. State by APA Matt Michael, defendant in person and with Atty. Dan Moore.  Preliminary Examination & Motion to Suppress heard on the record.  Motion to Suppress sustained.  The Court finds that the search warrant wasn't executed as soon as practical.  At the conclusion of the evidence the court finds that no probable cause exists to believe the defendant committed the felonies charged in the complaint.  Defendant ordered discharged, case ordered closed. So Ordered. TDS/srr."  (Govt. Exhibit 3).

The Ripley County Prosecuting Attorney thereafter referred the case for federal prosecution.  Cameron Acosta and James Moore were indicted on December 1, 2020.[1] Cameron Acosta filed this Motion to Suppress Evidence and simultaneously filed a Motion to Dismiss pursuant to HB85.  (Doc. No. 31 and Doc. No. 32).  The Government anticipates calling Sergeant Jesse Drum and TFO Scott Johnston to testify at the hearing.

## Argument

Probable cause existed for the issuing judge to find that there was a fair probability that illegal narcotics and firearms would be present at the residence searched.  Under the Fourth Amendment, a neutral and detached judicial officer must make the determination whether law enforcement officers have probable cause to conduct a search.  Probable cause exists when the facts available to the officer would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present.

### 1.  The Search Warrant was Supported by Probable Cause

#### A.  *Sufficiency of Information*

Acosta challenges the sufficiency of the information contained in the search warrant.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and

---

[1] James Moore was charged in a single count Indictment with Possession of a Firearm by a Convicted Felon. Thereafter, the Indictment was superseded to add an additional count of Possession of a Firearm by a Convicted Felon for an event that occurred on December 9, 2020.  James Moore has since entered a plea of guilty to both counts and was sentenced by United States District Judge Stephen R. Clark for the Eastern District of Missouri to a term of 41 months imprisonment in the BOP followed by 3 years of supervised release.

requires that "no Warrants shall issue, but upon probable cause." U.S. Const. Amend. 4.

Under the Fourth Amendment, a neutral and detached judicial officer must make the

determination whether law enforcement officers have probable cause to conduct a search.

*Warden v. Hayden*, 387 U.S. 294, 301-02 (1967). "A police officer has probable cause to

conduct a search when the facts available to him would warrant a person of reasonable

caution in the belief that contraband or evidence of a crime is present. *Florida v. Harris*,

133 S. Ct. 1050, 1055 (2014) (internal quotations and citations omitted). When reviewing

a search warrant application, the issuing judge's task is "simply to make a practical,

common-sense decision whether, given all the circumstances set forth in the affidavit. . .

there is a fair probability that contraband or evidence of a crime will be found in a particular

place." *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (quoting *Illinois v.

Gates*, 462 U.S. 213, 238 (1983)); *see also United States v. Terry*, 305 F.3d 818, 822 (8th

Cir. 2002) (when the affidavit supporting the search warrant sets forth facts sufficient to

create a fair probability that evidence of a crime will be found in the place to be searched,

probable cause exists).

Probable cause is all the Fourth Amendment requires, and "[t]he test for probable

cause is not reducible to 'precise definition or quantification.'" *Harris*, 133 S. Ct. at 1055

(quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Rather, it is a practical, common-

sense standard that "requires only a probability or substantial chance of criminal activity,

not an actual showing of such activity." *District of Columbia v. Wesby*, 138 S.Ct. 577, 586

(2018) (quoting *Gates*, 462 U.S. at 234-44)). The Supreme Court has consistently

recognized that "[p]robable cause 'is not a high bar.'" *Wesby*, 138 S.Ct. at 586 (quoting

*Kaley v. United States*, 134 S.Ct. 1090, 1103 (2014)).  And the determination of "whether or not probable cause supports the issuance of a warrant [is] based upon a common-sense reading of the entire affidavit."  *United States v. Mazzulla*, 932 F.3d 1091, 1098 (8th Cir. 2019) (citing *United States v. Seidel*, 677 F.3d 334, 338 (8th Cir. 2012) (internal quotation marks omitted).  Notably, once a judicial officer has issued a warrant based upon a finding of probable cause, that finding deserves great deference.  *Gates*, 462 U.S. at 236; *United States v. Kattaria*, 553 F.3d 1171, 1175 (8th Cir. 2009); *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008).  Indeed, the issuing judge's determination that probable cause exists will not be disturbed "unless there was no substantial basis for that finding."  *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Montgomery*, 527 F.3d 682, 686 (8th Cir. 2008)).  "A grudging or negative attitude by reviewing courts towards warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant, and "courts should not invalidate … warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner."  *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

Here, although the Government admits the information contained in the warrant was succinctly stated, the Affidavit still contained sufficient information to support a fair probability that illegal narcotics existed at the residence to be searched.  The Affidavit was based upon information provided by a confidential source (CS) that CS had purchased quantities of marijuana, cocaine, and Xanax bars from James Moore at his residence.  The Affidavit also provided information that  CS had made such purchases over *twenty* times

in the recent past.  The Affidavit further provided that just three weeks prior, CS had purchased an eight ball of cocaine from Moore.  The Affidavit also contained information that additional drugs would be found in the residence.  CS had purchased up to a quarter pound of marijuana from Moore but Moore had agreed to sell CS four times as much, or up to a pound of marijuana, at a time.  Moore had also agreed to sell CS up to an ounce of cocaine at a time. Noteworthy, CS had been purchasing drugs from Moore for an entire year, "[t]he confidential source stated they have been purchasing narcotics from James Moore for the last year," indicating a notable level of familiarity between the two. Finally, CS stated that Moore *always* has narcotics available for sale.

CS described the residence as a white mobile home on County Road 142E-8 and assisted Sgt. Drum with obtaining the GPS coordinates for the residence by way of Google Earth, documented in the Search Warrant  as 36º35´27.23´´ North by 90º47´45.51´´West. Thereby, leaving no question as to the location of CS's drug buys and the target residence to be searched.  Considering all of the facts contained in the Affidavit, there certainly existed a fair probability that illegal narcotics would be found at the residence to be searched.

## B. *Reliability of Confidential Source*

Acosta contends that the search warrant falls short for failing to reflect that the information came from a reliable informant and cites *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  (Doc. No. 31, ¶ b).  To be certain, an "informant's reliability, veracity, and basis of knowledge are relevant considerations – but not independent essential elements – in

finding probable cause." *United States v. Knutson*, 967 F.3d 754, 758 (8th Cir. 2020) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)). "[W]hen probable cause depends on information provided by a source, the determinative factor is not the source's history alone, '[t]he core question . . . is whether the information is reliable.'" *United States v. Evans*, (No. 19-3780) (8th Cir. July 12, 2021) citing *United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013) (alterations in original) (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)).

This Court has recognized, "[i]nformation may be sufficiently reliable to support a probable cause finding if it is corroborated by independent evidence." *Knutson*, 967 F.3d at 758 (quoting *Keys*, at 518). *See also United States v. O'Dell*, 766 F.3d 870, 874 (8th Cir. 2014) (observing "it is well established that even the corroboration of minor, innocent details can suffice to establish probable cause.") *Id*. (quotations omitted) (concluding probable cause existed when officers corroborated the named defendant's residence through two sources).

Moreover, this Court has consistently held that an informant's basis of knowledge is strong when he or she has personally observed evidence of criminal activity. *United States v. Jackson*, 898 F.2d 79, 81 (8th Cir. 1990) (finding probable cause based, in part, on "the richness and detail of a first-hand observation" of an informant's tip). *See also*, *Evans*, No. 19-3780 ("[t]he source's firsthand observation of the drug sales combined with specific and detailed descriptions provided a fair probability that evidence of a crime would be found.").

Under the facts of our case, Sgt. Drum corroborated the information contained in the affidavit by independently verifying the address of James Moore by locating its GPS coordinates with CS's assistance. Sgt. Drum thereafter drove by the property to physically lay eyes on the residence himself.

Additionally, CS informed Sgt. Drum that CS purchased cocaine, marijuana, and Xanax bars from Moore over twenty times in the past year. CS described purchasing an eight-ball of cocaine three weeks prior and purchasing up to a quarter pound of marijuana at a time. Finally, CS informed Sgt. Drum that Moore had agreed to sell CS up to an ounce of cocaine at a time and up to a pound of marijuana. As noted in *Gates*, the "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles [the] tip to greater weight than might otherwise be the case." *Gates*, 462 U.S. at 234. According to the CS, there were at least twenty occurrences of first-hand observations of drug activity reported.

Finally, CS provided the information to Sgt. Drum in person. This Court has long accorded known informants more credence than anonymous ones because they can be held responsible if the allegations turn out to be fabricated. See *United States v. Stevens*, 530 F.3d 714, 718-19 (8th Cir. 2008); *Unites States v. Solomon*, 432 F.ed 824, 827-28 (8th Cir. 2005); *Knutson*, 967 F.3d at 758 ("[k]nown informants are generally more credible because they can be held accountable for false statements."). Sgt. Drum spent approximately one hour talking to CS, which allowed Sgt. Drum to gauge CS's knowledge and credibility. And the information CS provided to Sgt. Drum was against CS's penal interest. CS

admitted to purchasing illegal narcotics from Moore over twenty times and provided weights not indicative of personal use, rather, distributable quantities of drugs. These admissions implicated CS in much more serious felonies then simple possession of a controlled substance. See *United States v. Pennington*, 287 F.3d 739, 742-43 (8th Cir. 2002) (finding of probable cause was supported by the fact that informant implicated himself in criminal activity).

### C.  *Timeliness of Search*

Acosta raises a challenge to the information being "current" enough to show probable cause still existed at the time of the search. Indeed, "[p]robable cause must exist when a warrant is issued, not merely at some earlier time." *United States v. Formaro*, 152 F.3d 768 (1998) (quoting *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996). While this is true, "[t]here is no bright-line test for determining when information is stale. Whether the averments in an affidavit are sufficiently timely to establish probable cause depends on the particular circumstances of the case, and the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *Id*. at 771 (citing *LaMorie*, at 554) (quoting *United States v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993). "Where continuing criminal activity is suspected, the passage of time is less significant." *Id*. (quoting *LaMorie*). Which is often the case with drug buys, "in investigations of ongoing narcotics operations, 'intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale.'" *Id*. quoting *United States v. Ortiz*,

13

143 F.3d 728, 732-33 (2d Cir. 1998) (quoting *Rivera v. Untied States*, 928 F.2d 592, 602 (2nd Cir. 1991); see also, *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (" 'With respect to drug trafficking, probable cause may continue for several weeks, *if not months*, of the last reported instance of suspect activity.'") (quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986). *See also*, *Unites States v. Jones*, 801 F.2d 304, 214 (8th Cir. 1986) ("[t]he fact that seven months passed between the transaction and the warrant is not significant due to the protracted nature of this drug case."

Sgt. Drum's Affidavit contained information that CS had purchased narcotics from Moore over twenty times in the recent past.  Moore had supplied CS with drugs throughout the course of a year.  And, the most recent purchase had occurred just three weeks prior for an eight-ball of cocaine where Moore informed CS he would sell CS up to an ounce at a time.  Further, CS indicated Moore "always" has drugs for sale.  In the context of this case and the nature of trafficking drugs, the information was sufficiently current to support probable cause at the time of the search.

### D. *Nexus of Place*

Acosta also challenges the sufficiency of the nexus between the criminal conduct and the place to be searched.  The Eighth Circuit, consistent with the majority of circuits, takes a very broad stance on nexus.  The nexus between the place to be searched and the items to be seized may be established simply by the nature of the item and the normal inferences of where one would likely keep such evidence.  *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) (people who own pistols generally keep them at home or on

14

their persons); *United States v. Dresser*, 542 F.2d 737 (8th Cir. 1976) (only reason to search defendant's home for evidence of robbery is fact he was identified as the robber and this is where he lives, held sufficient probable cause over challenge that no one saw any stolen items in his home.); s*ee also*, *United States v. Rahn*, 511 F.2d 290, 293 (10th Cir. 1975) (it was reasonable to assume that individuals keep weapons in their homes); *Bastida v. Henderson*, 487 F.2d 860, 863 (5th Cir. 1973) (a very likely place to find pistols would either be on the persons of the assailants or about the premises where they lived); *United States v. Jacobs*, 715 F.2d 1343, 1346 (9th Cir. 1983) (it was reasonable for the magistrate to conclude that articles of clothing would remain at the residence).

The Affidavit expressly stated that CS was purchasing drugs from Moore at his residence.  CS provided the address as County Road 142E-8, described the home as a "white mobile home," and assisted Sgt. Drum with locating the GPS coordinates.  The search was for narcotics and firearms; therefore, permitting a search of anywhere in the home these items might be kept.  "A warrant that authorized an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found.  A warrant to open a footlocker to search for marijuana would also authorize the opening of packages found inside.  A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search."  *United States v. Ross*, 456 U.S. 798, 821 (1982).

Acosta cites *United States v. Frasier*, 423 F. 3d 526, 536 (6th Cir. 1998), a Sixth Circuit case, where the affidavit lacked nexus between the place to be searched and the

evidence to be sought; however, the affidavit contained no information that defendant ever sold drugs out of his residence for probable cause to search it.  Whereas here, the Affidavit specifically mentioned drug buys occurring at the residence searched.  Acosta also cites *United States v. Anderson*, 851 F.2d 727 (4th Cir. 1988), a Fourth Circuit case, that takes the position of the Eighth Circuit in upholding a finding of probable cause to search defendant's residence for a .45 caliber handgun even though the affidavit contained no facts that weapons were ever seen there.  ("We find the holding in *Johnson* and that of the Fifth, Sixth, Eighth, and Ninth Circuits to be more persuasive.  It was reasonable for the magistrate to believe that the defendant's gun and silencer would be found in his residence.  Therefore, even though the affidavit contained no facts that the weapons were located in defendant's trailer, we reject his argument that the warrant was defective.")  *Id*.

### E. *Acosta's Bedroom*

Acosta raises a probable cause challenge to the search of a bedroom at Moore's residence.  First, the Government questions whether Acosta has standing to challenge the search.  The police report identified the west bedroom as Acosta's room.  However, there was no further information offered.  True, Acosta was inside the room when the warrant was executed.  Also true, he later admitted ownership of the two firearms found in the room.  However, that is not to say he was not simply a business associate in town to deliver a shipment of drugs to Moore for further distribution.  In which case, Acosta would have no standing to challenge the search.   Although an overnight guest in a house may claim the protection of the Fourth Amendment, "one who is merely present with the consent of the homeowner may not."  *Minnesota v. Carter*, 525 U.S. 83 (1998).

16

Assuming *arguendo* Acosta did occupy the west bedroom of the residence; the search warrant was for the entire residence, including any outbuildings and vehicles located on the property.  "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."  *United States v. Ross*, 456 U.S. 798, 820 (1982).

This was not a consent search where one occupant consented to a search of another's property.  Nor did it involve a warrantless search of a motel room as occurred in the two cases relied on by Acosta.  *United Stated v. Bautista*, 362 F.3d 584 (9th Cir. 2004) (police officer's entry into defendant's motel room was a warrantless intrusion unsupported by probable cause); *United States v. Conner*, 127 F.3d 663, (8th Cir. 1998) (warrantless entry into motel room violated Fourth Amendment).  Here, the search occurred after law enforcement officers secured a search warrant, thereby permitting officers to search the entire residence, anywhere illegal narcotics and firearms could be found.

### F.  *Delay in Execution*

Acosta's final challenge is the time delay between securing the warrant and its execution, which Acosta deems "unjustifiable."  Doc. No. 31.  The warrant was signed by Judge Swindle on Friday, March 26, 2018, and executed seven days later, on Friday, April 2, 2018.  Pursuant to U.S.C. Rule 41(e)(A)(i), the search is to be conducted "within a specified time no longer than 14 days."  Indeed, a search warrant should be executed "promptly."  "If the police were allowed to execute the warrant at leisure, the safeguard of

17

judicial control over the search which the fourth amendment is intended to accomplish would be eviscerated.  It is generally accepted, however, that a warrant need only be executed within a reasonable time after its issuance…. Timeliness of execution should not be determined by means of a mechanical test with regard to the number of days from issuance, nor whether any cause for delay was per se reasonable or unreasonable.  Rather, it should be functionally measured in terms of whether probable cause still existed at the time the warrant was executed. … [Where] the initial probable cause which supported the issuance of the warrant continued to exist at the time of the search, despite a delay in the execution of the warrant…, the element of judicial control is not undermined by delay… *United States v. Shegog*, 787. F2d 420, 422 (8th Cir. 1986), quoting *United States v. Bedford*, 519 F.2d 650, 655-56 (3rd Cir. 1975).

In determining whether probable cause still exists, the Court considers the lapse of time since issuance of the warrant, the nature of the criminal activity, the kind of property subject to search, and whether the police had evidence of continuing or long-term criminal activity.  *United States v. Gibson*, 123 F.3d 1121, 1124 (8th Cir. 1997); *United States v. Morrow*, 90 Fed.Appx. 183, 184 (8th Cir. 2004).

Here, CS reported continuous and on-going drug activity at Moore's residence.  The Affidavit referenced twenty drug purchases in the recent past.  CS claimed to be purchasing cocaine and marijuana from Moore for over a year.  CS gave information as to weights, quantities, and maintained there were "always" drugs at the residence.  As such, the

probable cause Judge Swindle found to exist on March 26, 2018, still existed one week later, on April 2, 2018.

## 2.  <u>The Search Warrant was not Invalidated by a Numerical Error in Address</u>

Acosta points to an error in the address provided in the warrant, suggesting the officers searched the wrong residence.  This is certainly not the case.  The Government anticipates Sgt. Drum will testify when he drove by the residence to be searched, there were two mailboxes, located across the street, side by side, one numbered 9766 and one numbered 9788.  Sgt. Drum will further testify it was *he* who mistakenly believed the mailbox closer to the Moore residence was the mailbox for Moore's residence.  The CS correctly identified Moore's residence by describing it to Sgt. Drum and assisting him with locating it on Google Maps to determine the GPS coordinates.  There was never any question as to what residence belonged to Moore and what residence was the target residence for the search.


A technically wrong address does not invalidate a search warrant.  *United States v. McCain*, 677 F.2d 657, 660-61 (8th Cir. 1982).  "The test for determining the sufficiency of the description of the place to be searched is whether the place to be searched is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched."  *United States v. Gitcho*, 601 F.2d 369, 371 (8th Cir. 1979).  *See also*, *Lyons v. Robinson*, 783 F.2d 737 (8th Cir.

1985) (where warrant listed "325 Atkinson Street" search of "325 Short Street" upheld where officer obviously mistakenly read the street sign).  The Eight Circuit noted an important factor is whether the same officer both applied for and executed the warrant, as this factor alone strongly diminishes a mistaken search.  *McCain*, at 661.  The premises which were intended to be searched were, in fact, those actually searched.  *Gitcho*, at 372.

Here, the target residence was the residence of James Moore.  That was the residence intended to be searched and that was the residence that was actually searched.  Not only was it described accurately, the GPS coordinates for the residence were provided in the search warrant.  Sgt. Drum was the officer who obtained the information from the CS, the officer who applied for the search warrant, and one of the officers who participated in its execution.

### 3.  <u>Officers Acted in "Good Faith" Reliance on the Search Warrant's Validity</u>

The evidence clearly demonstrates that Sgt. Drum's Affidavit established probable cause to support the search warrant.  Nonetheless, even if the search warrant was found to be invalid or deficient in some respect, the officers acted in good-faith reliance on its validity.  In *United States v. Leon*, 468 U.S.897 (1984), the Supreme Court created a "good faith" exception to the exclusionary rule.  Evidence seized pursuant to a warrant that is later determined to be invalid will not be suppressed, provided the officers executing the warrant acted in good-faith reliance on its validity.  Suppression is required only if: (1) the issuing judge was misled by the affiant's knowing or reckless false statement; (2) the

issuing judge wholly abandoned their judicial role; (3) the supporting affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant was "so facially deficient" that the executing officers could not reasonably presume its validity.  Id. at 923.  "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the [issuing judge's] authorization."  *United States v. Clay*, 646 F.3d 1124, 1127 (8th Cir. 2011) (citation omitted).  *See also United States v. Kattaria*, 563 F.3d 573, 579 (8th Cir. 2010) (noting that even if Court were to hold search warrant affidavit failed to establish probable cause, suppression of evidence would not be appropriate where defendant had not shown officers acted unreasonably in carrying out the search).

Acosta does not allege that Sgt. Drum made any false statements, nor does he suggest that the issuing judge abandoned his judicial role.  Therefore, Acosta is either challenging that the Affidavit was so lacking in probable cause that belief in its existence was entirely unreasonable or that the warrant was so facially deficient that the executing officers could not reasonably presume its validity.

For the reasons discussed above, Sgt. Drum's Affidavit met the established standard for probable cause and the warrant was not so facially deficient as to render it invalid.  But even assuming that it somehow fell short, the officers nonetheless acted in good-faith reliance on the validity of the search warrant.

21

Another relevant consideration is whether the officers were aware of additional information not included in the Affidavit.  As this Court has recognized, "[i]n determining the presence of good-faith reliance on a judge-issued search warrant, the court must consider the totality of the circumstances, including information not presented to the judge issuing the search warrant but known to the police officers."  *Clay*, 646 F.3d at 1127.  The Government anticipates that Sgt. Drum will testify that earlier in the day on March 24, 2018, a Deputy Sheriff with the Ripley County Sheriff's Department conducted a traffic stop of a vehicle being driven by CS.  A felony amount of marijuana was recovered from CS during that stop.  The CS was arrested and transported to the Ripley County Sheriff's Department and Sgt. Drum was contacted to respond to the station to conduct an interview.  Sgt. Drum will further testify that CS told Sgt. Drum that CS had just purchased the marijuana from Moore at Moore's residence on County Road 142E-8 in Doniphan, Missouri, before being stopped by police.  The Government also anticipates that Sgt. Drum will testify that he had been hearing information about James Moore's involvement in marijuana sales for over one year.  These additional facts, known to Sgt. Drum and other law enforcement officers, further demonstrated that the officers acted in objectively reasonable reliance on the validity of the search warrant.  *Id*.

Yet another relevant consideration in this inquiry is whether a law enforcement officer consulted with an attorney prior to seeking the warrant.  *United States v. Conant*, 799 F.3d 1195, 1202 (8th Cir. 2015) (prosecutor's approval of application was factor making it objectively reasonable for officer to honestly believe search warrant was valid);

*United States v. Perry*, 531 F.3d 662, 666 n. 6 (8th Cir. 2008) ("Another factor that adds to the reasonableness of [an officer's] belief that the affidavit was not so lacking in probable cause was the county prosecutor's determination that the affidavit provided probable cause for the search."). Here, Sgt. Drum's Application was signed by the Ripley County Prosecuting Attorney Matthew Michael before it was signed by Judge Swindle. (Govt. Exhibit 4) (Application signed by prosecutor at 1:20 p.m. on March 26, 2018).

Finally, Sgt. Drum interviewed CS in person. This Court has observed that interviewing an informant in person is a "circumstance further supporting [an officer's] good-faith reliance on the warrant[.]" *Clay*, 646 F.3d at 1127; *United States v. Carpenter*, 422 F.3d 738, 744 (8th Cir. 2005) (finding "officers could assess the informant's credibility because the information was provided in person"). Likewise, Sgt. Drum had the opportunity to gauge CS's credibility during their in-person conversation before applying for the search warrant.

Examining the totality of the circumstances, even if the Affidavit somehow fell short of establishing probable cause, Sgt. Drum nevertheless acted in objectively reasonable, good-faith reliance on the validity of the search warrant.

### 4.  Acosta's Statements were Voluntary Admissions After a Valid Waiver of Miranda Rights

Acosta also seeks to suppress statements he made to law enforcement officers as the product of an illegal arrest as there was no probable cause to arrest him. "Probable cause for an arrest exists when the totality of the circumstances demonstrates that the arresting

officer personally knows . . . of sufficient facts to warrant a belief that a crime has been committed and that the person to be arrested committed it." *Reinholz*, 245 F.3d at 778 (citing *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)).   A search warrant was executed at a residence where narcotics and firearms were anticipated.   Acosta was one of three adults present inside the residence where narcotics and firearms were found.   Narcotics and firearms were found in common areas of the residence as well as in both bedrooms of the residence.   Acosta was the lone adult inside the west bedroom of the residence where two baggies of cocaine and two firearms were seized.   Undoubtably, probable cause existed to arrest Acosta.

Acosta was transported to the Ripley County Sheriff's Department where he was read his Miranda rights.   This was the second time Acosta was read his Miranda rights during this event. Acosta acknowledged his rights and agreed to speak to law enforcement officers.   Acosta never asked to speak to a lawyer.   Acosta confessed that the duffle bag and its contents were his.   There was an AK-47 assault rifle inside the bag, over 3,700 grams of marijuana and over 50 grams of cocaine.   Acosta made further admissions that he had three types of marijuana in the bag, "Loud," "Mid," and "Reggie," that could be distinguished by their level of purity.   He admitted he had cocaine in the bag called "Yolo" because it was "disrespectful" to call it cocaine.   He admitted that he had $7,000.00 worth of marijuana in the bag to sell.   Acosta further admitted he purchased one of the firearms for $35.00.   These statements were voluntarily made without coercion or duress after a valid Miranda waiver.

*Conclusion*

For all of these reasons, the Defendant's Motion to Suppress Evidence should be denied as to the narcotics and firearms seized and the statements he made on April 2, 2018.

SAYLER FLEMING,
UNITED STATES ATTORNEY

/s/ Julie A. Hunter
JULIE A. HUNTER, # 51612MO
ASSISTANT UNITED STATES ATTORNEY
555 Independence, 3rd Floor
Cape Girardeau, MO 63703
(573) 334-3736

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2021, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Curtis O. Poore
Attorney for Defendant

/s/ Julie A. Hunter
Julie A. Hunter
Assistant United States Attorney

25